IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

BACIL WARSON,                          )
                                       )
                    Plaintiff,         )
                                       )
        v.                             )        Case No.
                                       )        06-3086-CV-S-REL-SSA
LINDA MCMAHON, Acting                  )
Commissioner of Social                 )
Security,                              )
                                       )
                    Defendant.         )

## ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Basil Warson seeks review of the final decision of the Commissioner of Social

Security denying plaintiff's application for disability benefits under Title XVI of the Social

Security Act ("the Act"). Plaintiff argues that (1) the ALJ erred in finding that plaintiff could

return to his past work as a delivery truck driver, and (2) the ALJ failed to derive a proper

residual functional capacity. I find that the substantial evidence in the record as a whole

supports the ALJ's finding that plaintiff is not disabled. Therefore, plaintiff's motion for summary

judgment will be denied and the decision of the Commissioner will be affirmed.

## I.      BACKGROUND

On September 18, 2002, plaintiff applied for disability benefits alleging that he had been

disabled since August 31, 2002. Plaintiff's disability stems from bipolar disorder and depression.

Plaintiff's application was denied on September 29, 2002. On July 19, 2004, a hearing was held

before an Administrative Law Judge. On October 29, 2004, the ALJ found that plaintiff was not

under a "disability" as defined in the Act. On December 30, 2005, the Appeals Council denied

plaintiff's request for review. Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

## II. STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner. The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996). The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision. Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989). "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing Steadman v. Securities & Exchange Commission, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991). However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts. "[A]n administrative decision is not subject to

reversal merely because substantial evidence would have supported an opposite decision." Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

## III.    BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of proving he is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). If the plaintiff establishes that he is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform. Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled. These regulations are codified at 20 C.F.R. §§ 404.1501, et seq. The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

    1.      Is the claimant performing substantial gainful activity?

                Yes = not disabled.
                No = go to next step.

    2.      Does the claimant have a severe impairment or a combination of impairments which significantly limits his ability to do basic work activities?

                No = not disabled.
                Yes = go to next step.

3

3.      Does the impairment meet or equal a listed impairment in Appendix 1?

       Yes = disabled.
       No = go to next step.

4.      Does the impairment prevent the claimant from doing past relevant work?

       No = not disabled.
       Yes =  go to next step where burden shifts to Commissioner.

5.      Does the impairment prevent the claimant from doing any other work?

       Yes = disabled.
       No = not disabled.

## IV.      *THE RECORD*

The record consists of the testimony of plaintiff and vocational expert Michael Lala, in addition to documentary evidence admitted at the hearing.

## A.      *ADMINISTRATIVE REPORTS*

The record contains the following administrative reports:

**Earnings Record**

The record establishes that plaintiff earned the following income from 1981 through 2004:

| Year | Earnings | Year | Earnings |
|------|----------|------|----------|
| 1981 | $   59.00 | 1993 | $3,186.00 |
| 1982 | 5.86 | 1994 | 0.00 |
| 1983 | 4,188.27 | 1995 | 0.00 |
| 1984 | 370.99 | 1996 | 0.00 |
| 1985 | 341.74 | 1997 | 88.00 |

Case 6:06-cv-03086-REL   Document 12   Filed 02/12/07   Page 4 of 40

| | | | |
|---|---|---|---|
| 1985 | 5,421.57 | 1998 | 749.38 |
| 1987 | 7,344.88 | 1999 | 0.00 |
| 1988 | 3,063.54 | 2000 | 0.00 |
| 1989 | 2,331.15 | 2001 | 0.00 |
| 1990 | 2,869.73 | 2002 | 0.00 |
| 1991 | 1,587.02 | 2003 | 0.00 |
| 1992 | 5,596.10 | 2004 | 0.00 |

(Tr. at 103-108).

**Disability Report**

On October 7, 2002, plaintiff completed a Disability Report wherein he stated that he had previously worked as a delivery driver for J. C. Penney (Tr. at 111). In that job, he lifted a maximum of 20 pounds and he frequently lifted 25 pounds, which obviously makes no sense (Tr. at 111).

**Work History Report**

On October 23, 2002, plaintiff completed a Work History Report wherein he stated that on his job as a truck driver, he lifted a maximum of 20 pounds and he frequently lifted ten pounds (Tr. at 126). This apparently is the information relied on by the vocational expert in finding that plaintiff performed this job at the light level, although it is not a job typically performed at the light level (Tr. at 73).

**Claimant Questionnaire**

On October 28, 2002, plaintiff completed a Claimant Questionnaire (Tr. at 132-135). He reported that he has no difficulty preparing meals, following directions, or shopping (Tr. at

5

133).  He is able to do household repairs without assistance (Tr. at 133-34).  He enjoys puzzles, cards, and board games (Tr. at 134).  Plaintiff is able to drive to take his kids to school and to go shopping (Tr. at 134).  He has no problems managing money, and he has no difficulties in leaving the house or being away from home (Tr. at 134).

**B.**   *SUMMARY OF MEDICAL RECORDS*

On October 1, 1990, plaintiff was admitted to Truman Medical Center East (Tr. at 276-279).  He was seen by Dave Robinson, D.O., who wrote the following:

CHIEF COMPLAINT:  The patient was admitted to fourth floor psychiatric involuntarily because he refused chemotherapy which he was receiving at St. Luke's.

HISTORY OF PRESENT ILLNESS:  The patient is a 25-year-old white male who was diagnosed as having testicular cancer in late June, early July, 1990.  He underwent surgery for surgical removal of one testes and was placed in chemotherapy. . . . The patient reports that he experienced a lot of nausea and vomiting and hair loss, was using marijuana as per prescription to treat side effects and after careful consideration of his condition and his prognosis, told me that he is going to stop receiving chemo, chooses to stop taking the chemotherapy.  I spoke to him at length explaining a good outcome that we have in treating testicular cancer and he said that he didn't believe me, first of all, and even if it were true, he has made up his mind and that's that.  I found him to be very rigid with his position.  I did refer him to some medical books, Harrison's and Cecil's. Recommended others that he should consult to find out exactly what his prognosis is.  I encouraged him to consider that he has an eight month old son and family, but he was adamant and would not really consider anything from my position.

Plaintiff also saw Peggy Sherian, M.S.W., while at Truman Medical Center (Tr. at 278-279).  Her report reads in part as follows:

REASON FOR ADMISSION:  This 25-year-old divorced, white male was refusing his chemotherapy treatment.  Four months ago he learned that he had testicular cancer. The disease has spread in his chest.  He took his first series of chemotherapy treatments as ordered.  The treatments lasted five days.  Then he has three weeks being off treatment, then he would have begun five more days.  He refused to go to his second series of chemotherapy treatments.  He said that he wanted to die.  At his parents' home, he became violent and started tearing up the house.  His parents had him arrested.  His

6

mother got him out of jail the next day as he said he would take his treatments. His third series of treatments was to begin on Sept. 17. He refused to go because he says he does not want to live. . . .

CURRENT LEGAL PROBLEMS: In January, 1990, he stole some of his parents' checks. He cashed them. He used the money to buy crack cocaine. The patient's parents pressed charges. He has made restitution. He is now on "court probation" through the Jackson County Court. He was held in jail for two days pending this action. Bacil has a driver's license but he has no car. He has never had DWI's.

SUBSTANCE ABUSE: He admitted to crack cocaine use for the past one year. He admits to marijuana, cocaine and alcohol use. He smokes one pack of cigarettes per day. He has never been to any substance abuse treatment programs. . . .

FAMILY SUPPORT: His parents are very supportive. They brought him to the hospital so he could get mental health treatment.

Plaintiff told M. A. Mirza, M.D., that he had a friend who also had testicular cancer and died, and plaintiff had been feeling that it was useless to go through the chemotherapy and suffer the nausea, vomiting, and hair loss when he is not sure that it will increase his survival (Tr. at 281). Plaintiff was referred to education and support groups for people who have cancer.

Plaintiff was a patient at Truman Medical Center East from January 21, 1991, through January 29, 1991 (Tr. at 245-247, 270). The report of M. A. Mirza, M.D., reads in part as follows:

REASON FOR ADMISSION: The patient is a 25-year-old Caucasian male, divorced. He was admitted because he has been suffering from testicular cancer, metastatic and received treatment, and most of the metastases are resolved except that he came to know that he is having metastases to the lymph nodes. The patient has ongoing conflict with treatment and he is resistant, not realizing the need for treatment. He fights and wants to be in control. The patient blames everybody for his condition. He felt that they are not relieving him. The patient blames his urologist, he blames the system. The patient is very angry and upset. The patient has difficulty dealing with the severe condition, so he is projecting his frustration and not realizing the significance of treatment and the response. The patient became depressed, suicidal, withdrawn, so he was hospitalized.

7

PAST PSYCHIATRIC HISTORY:  One admission in 10/1990 for similar reason, no other previous treatment. . . .  The patient still abuses drugs.

FAMILY HISTORY:  Other family members abuse drugs.  He is not giving much information about that. . . .

MEDICAL HISTORY:  The patient has testicular cancer with lymph node involvement.  He had metastases to lungs which have been treated. . . .

INITIAL DIAGNOSIS:
Axis I:          Adjustment disorder with depressed mood.  Mixed substance abuse.
Axis II:         Testicular cancer.  Metastases.

HOSPITAL COURSE:  . . .  The patient is a very difficult patient.  He is not psychologically minded.  He is not recognizing his difficult[ies] which are leading to his problem.  The patient is hopeless and negativistic.  We acknowledge that [he] is going through a severe crisis but there is a method [and] technique to resolve [the crisis] rather than feeling helpless and blaming and not working with the system.  The patient had a good chemotherapy program and the urologist is working free for him.  The patient is not realizing how important and significant the treatment is.  The patient was educated and confronted.  He was supposed to have four chemotherapy course[s] and he decided not to.  After therapy, discussing and encouraging, finally the patient decided he will go through outpatient therapy and requested a discharge.

On March 3, 1999, plaintiff saw William Mathews, D.O. (Tr. at 222).  "He has had some things going on in his body that he doesn't know how to explain.  He has a history of testicular cancer so he relates everything to that, which would be natural."  Dr. Mathews took a chest x-ray which was normal.  He assessed history of testicular carcinoma without adequate follow-up.  Dr. Mathews ordered a CT of the abdomen and some blood work.

On March 10, 1999, plaintiff saw Williams Mathews, D.O., to get the results of his tests (Tr. at 223).  The CT of the abdomen was negative for recurrence of cancer.  He had elevated blood sugar.  Another blood test was done this day and his blood sugar was 229.  He was diagnosed with type II diabetes and was started on Amaryl and a 1,500 calorie diabetic diet.

8

On November 24, 2000, plaintiff saw Joyce Nichols, RN, complaining of a sore throat and cough (Tr. at 200). She noted he was smoking a pack of cigarettes per day. "He also has a history and is being treated currently for diabetes with Amaryl. He does not check is blood pressure. He does not check his blood sugar. He only seeks care sporadically and is not consistently seen by a provider at this point in time." Plaintiff's blood sugar was 238. Ms. Nichols provided diet education and stressed the need for more comprehensive care. He says, "Yeah, I have been kind of neglecting my care." He says, "I will be back in two weeks and we will go from there.'"

More than a year later, on January 7, 2002, plaintiff saw Joyce Nichols, RN (Tr. at 198). Portions of Ms. Nichols's report read as follows:

> SUBJECTIVE: Patient presents today with a chief complaint of wanting to talk about having a referral to a psychiatrist or a psychologist. He reports he has quite a bit of emotional issues stemming from childhood. He is not willing to disclose those at this time. He is accompanied today with his wife and they discussed that there is quite a bit of anger management problems. He gets frustrated. He screams and yells. He throws things. When I questioned Bacil about risk of suicide I asked him he said he does think about it and I asked him what kind of plan did he have and he said he's not going to tell me. His wife said he probably will just kill us all if he does anything. . . . He does not work now due to the fact that they have a very ill child that they are running back and forth to Memphis with. However, his emotional stability and well-being has been pretty much put to the test because of this but reports he's always had problems with anger management ever since a child. He also has diabetes and is noncompliant. He's not on any medicines. He doesn't know when's the last time he checked his blood sugar other than that of when he was here, which was November 2000. . . .

> DIAGNOSTIC STUDIES/PLAN: . . . A random blood sugar was drawn today. I also had him do a Zung scale[1], which he scored 54/53 with mild depression present. An

_____

[1]The Zung Self-Rating Depression Scale is a 20-item self-report questionnaire that is widely used as a screening tool, covering affective, psychological and somatic symptoms associated with depression. The questionnaire takes about ten minutes to complete, and items are framed in

appointment was made with him to see Dr. Olomon on January 21 and he said he would not do anything radical, he's just really interested in getting into counseling so he can come to some terms about some of these childhood issues he has. I stressed with him the need to be more compliant with his diabetes as he needs to realize that if his sugar is controlled he will feel better. I also started him on Depakote 500 mg x 1 at bedtime. . . . His blood sugar today is 284 and [he] has left the building before getting results of this. . . . Again stressed with Bacil the need to monitor his diet closely and to be on some medicine. He had been on Amaryl in the past but it not taking it now. . . . A telephone call was placed to his home regarding his blood sugar and stressed with him needing to be on some medication. He said it's been at least a year since he's been off. He is willing to go back on the Amaryl and we'll start him out at 4 mg. . . .

From January 18, 2002, through January 28, 2002, plaintiff was a patient at Cox Health Systems (Tr. at 153-164). Plaintiff was seen by multiple doctors during his stay. Portions of those doctors reports read as follows:

**Jess Lyon, D.O.:**

HISTORY OF PRESENT ILLNESS: . . . He has had several stressors in his life recently, including his father dying approximately a year ago His daughter was diagnosed with hepatoblastoma [childhood liver cancer], which has metastasized to multiple sites, and he has been having trouble coping with these. He was started on antidepressant at one time, but it did not do him any good, he said. He also complains of having headaches in the evening. . . .

SOCIAL HISTORY: He is currently married, but separated. Smokes a pack per day. Quit marijuana approximately two months ago. Denies any alcohol abuse. He works kind of as a jack-of-all-trades, but has done truck driving and hauling mostly. . . .

REVIEW OF SYMPTOMS: . . . Admits to occasional palpitations when he gets anxious. . . . Denies forgetfulness. . . .

---

terms of positive and negative statements. Each item is scored on a Likert scale ranging from one to four. A total score is derived by summing the individual item scores, and ranges from 20 to 80. Most people with depression score between 50 and 69, while a score of 70 and above indicates severe depression. The scores provide indicative ranges for depression severity that can be useful for clinical and research purposes, but the Zung scale cannot take the place of a comprehensive clinical interview for confirming a diagnosis of depression.

MUSCULOSKELETAL:  Normal range of motion in all joints without elicitation of pain. . . .

NEUROLOGICAL:  . . .  Strength was 5 out of 5 in both upper and lower extremities. Romberg[2] sign was negative.  Clonus[3] was negative.  Gait was normal.  Finger-to-nose was normal. . . .

IMPRESSION:
1.      Major depressive disorder with suicidal ideations.
2.      History of hypertension and diabetes, not currently on medical treatment.

Dr. Lyon recommended psychiatric medication adjustment, group therapy, and

hypertension medication (Tr. at 156).

**Joseph Babin, M.D.:**

HISTORY OF PRESENT ILLNESS:  The patient is a 36-year-old Caucasian male who was referred from the Bolivar Hospital there yesterday.  He apparently had come there and said he was suicidal.  He gives a long, complicated story, but the essence of it is that his wife left him, his mother refuses to let him live in her house, which she had previously provided, and he has alienated St. Jude's Hospital where his daughter is in treatment for liver cancer.  He implies that there is some sort of conspiracy between his family, his wife, and St. Jude's Hospital.  His wife is currently in Kansas City, having left him earlier in the week.  Apparently, his 8-year-old daughter is with her now. He says that the problem between himself and St. Jude's Hospital is that he asked them to maintain a car for him.  He said they had relied upon him to drive his daughter back and forth for treatment, and when he asked them to run a car for him, they refused to do so.  The patient does not work.  He and the family have been living on his sick daughter's SSI.

---

[2]The person is asked to stand erect with feet together and eyes closed.  A positive sign is noted when a swaying, sometimes irregular swaying and even toppling over occurs with eyes closed, but the person is able to stand upright with eyes open.  The Romberg test is a non-specific test of neurological or inner ear dysfunction

[3]Clonus is repetitive, rhythmic contractions of a muscle when attempting to hold it in a stretched state. It is a strong, deep tendon reflex that occurs when the central nervous system fails to inhibit it. Clonus is not the same thing as myoclonus, which is irregular and uncontrollable jerks of a muscle or group of muscles.  Clonus in initiated in the spinal cord and is usually a sign of damage to the nerve tracts above the place where it is initiated. It is a common sign of multiple sclerosis, spinal cord injury, spastic paraparesis and other diseases.

PSYCHIATRIC HISTORY: . . . He has never been in jail or prison and denies any history of addiction, although he has been using marijuana fairly frequently.

MEDICAL HISTORY: . . . He also says he has diabetes and was treated with an oral hypoglycemic, probably Amaryl. He did not take this but does not say why he did not take the medication or was not currently taking the medication. He also has vascular hypertension and is not being treated for that either. . . .

MENTAL STATUS EXAMINATION: The patient is a middle-aged, Caucasian male. His speech is clear. His hygiene is poor with especially poor oral hygiene. He denies auditory or visual hallucinations. He has suicidal thoughts. He is alert and normally oriented. His insight is poor. His intellect is judged as average consider[ing] his vocabulary and grasp of ideas. His judgment does not appear grossly impaired.

IMPRESSION:
Axis I:      Major depression with suicidal thoughts.
Axis II:     Deferred
Axis III:    1. Status post testicular cancer.
             2. Diabetes mellitus.
             3. Vascular hypertension.
Axis IV:     Problems with the family, patient homeless.
Axis V:      GAF 30[4].

Dr. Babin recommended that plaintiff take part in group and activity therapy, and that he meet with a social worker to learn about resources available to help him. Dr. Babin wrote that medication would be "considered" for plaintiff's depression.

**Rachel Winkler, M.S.W.:**

INFORMATION SOURCE: Information for this psychosocial assessment was obtained through an interview with Bacil on January 21, 2002, and a review of the current record. Bacil is a somewhat questionable historian. . . .

---

[4]A Global Assessment of Functioning of 21-30 means behavior is considerably influenced by delusions or hallucinations or serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) or inability to function in almost all areas (e.g., stays in bed all day; no job, home, or friends).

12

LIVING SITUATION AND FAMILY HISTORY: . . . He was twenty-one when he married his first wife, Elaine. They were married for three and a half years. He says she left him for no apparent reason; he has no idea why she left. He married Brenda nearly eight years ago. He would have been about twenty-eight at that time. They have two children: Eight-year-old Jessica and five-year-old Samuel. Bacil states that Brenda has some learning disabilities and can be easily manipulated. He states that his wife's family has interfered in their marriage.

Bacil stated that he feels wronged by his family, because his father was planning to deed over some of his land to Bacil, but that never happened, and his father died two years ago. Bacil feels that he has not had his just rewards from his father's estate, although he has never held a job for long, and has been dependent on his family to support him and his own family for over five years now. He became very angry when his mother changed the locks on her home. He is assuming that she has also changed the locks on the home where he had been living. When asked why she would do such a thing, he states that he thinks she did it in order to make him angry enough to do something violent. When asked why he thinks his family wants him to have to go to jail, he said because they would at least know where he was. Bacil's logic was very difficult to follow at times during this interview.

He had reported that he doesn't think his family thinks he should work. He says that he was doing a righteous thing by taking care of his daughter and transporting her to and from St. Jude's Hospital for treatment.

His wife left him on Monday. He was angry about that, but then states that he asked her to leave. He stated he wasn't going to be able to transport Jessica to St. Jude's any longer. St. Jude's has offered to transport Jessica themselves. Bacil reports, after some direct questioning, that he has become verbally abusive to his wife, calling her names. He states he has never threatened her or any of his family members. He states that he does get violent; he throws things and damages property, but has never harmed anyone else. . . .

Suicidality and self-harm: Bacil states that he has thoughts of harming others who are "crushing" his world. He reports that he was developing a plan for suicide, but was not specific about that. He states he has never made a suicide attempt. . . .

BEHAVIORAL AND SUBSTANCE ABUSE ISSUES: Bacil denies any addictions, although he uses marijuana frequently, according to the chart. . . .

EDUCATIONAL/VOCATIONAL HISTORY: Bacil quit school in the tenth grade and did not obtain a GED. He went to vocational training at a truck driving school. He said he paid a lot of money to do that, and then only drove a truck for about six months. He says he still plans eventually to do that. He worked in construction for a little while, but

says he has never really kept a job; he states that something always happens to make working difficult for him.

ECONOMIC SITUATION: Bacil and his family have been living on his daughter's Social Security benefits and no other income. Bacil again has not been working for the last five years, and before that, he worked sporadically. He has been dependent on family members to help him.

CLINICAL IMPRESSIONS: Bacil was appropriately dressed during the interview. His affect was bland. He answered questions in a manner difficult to follow. He seemed to have very little insight regarding how his behavior directly affected his situation. He seemed to tend to blame others for his situation and the situation in which his family finds themselves. He seemed minimally motivated to make active changes in his life currently. He didn't seem to have any ideas of his own on what to do to remedy his situation.

Ms. Winkler recommended supportive training in communication and anger management skills, individual and group therapy, and medication education.

On March 29, 2002, plaintiff was seen by William Mathews, D.O., for medication refills (Tr. at 197). "The patient seems well-groomed, well-nourished, and calm today. He's in no distress." Plaintiff requested mental health follow up, and Dr. Mathews noted he would set up an appointment for plaintiff to see a psychiatrist.

On April 5, 2002, plaintiff had blood work done which showed his cholesterol high at 262 (normal is 239), high triglycerides high at 1,058 (normal is below 150), and his HDL low at 23 (normal is greater than 35) (Tr. at 172).

On April 15, 2002, plaintiff saw Angela Olomon, D.O. (Tr. at 187). Plaintiff was angry over his daughter's cancer and recent leg amputation. Plaintiff was breaking objects, punching the walls, and scaring his wife. Plaintiff said he was given Wellbutrin in January, and it was helpful but he ran out in February. Plaintiff was smoking a pack of cigarettes per day, and his

14

marijuana use was described as "1-2/wk". Dr. Olomon assessed major depressive disorder, recurrent, severe. His GAF was 50/65[5]. She prescribed Wellbutrin and recommended anger control counseling.

On June 24, 2002, plaintiff saw Angela Olomon, D.O. (Tr. at 186). Plaintiff's wife said he was not getting better. He was sleeping during the day time, avoiding activities with people, having conflicts and legal issues with his mother. Dr. Olomon discontinued Wellbutrin and prescribed Depakote.

On July 2, 2002, plaintiff saw Angela Olomon, D.O. (Tr. at 185). Plaintiff had had no anger outbursts, some improvement. She continued him on his same medications, Depakote augmented with Trazodone.

On July 3, 2002, plaintiff saw William Mathews, D.O. (Tr. at 195). He described plaintiff as his "normal self", calm, pleasant, and in no distress. His fasting blood sugar was 161. He ordered lab work and told plaintiff to "continue care as is."

On July 3, 2002, plaintiff had blood work done which showed his HGB A1C[6] at 7.6,

---

[5]A Global Assessment of Functioning of 50 means serious symptoms. A GAF of 65 means some mild symptoms but generally functioning pretty well.

[6]HGB A1C, or hemoglobin A1C test. The A1C test is used primarily to monitor the glucose control of diabetics over time. The goal of those with diabetes is to keep their blood glucose levels as close to normal as possible. This helps to minimize the complications caused by chronically elevated glucose levels, such as progressive damage to body organs like the kidneys, eyes, cardiovascular system, and nerves. The A1C test gives a picture of the average amount of glucose in the blood over the last few months. It can help a patient and his doctor know if the measures they are taking to control the patient's diabetes are successful or need to be adjusted. The A1C test is frequently ordered on newly diagnosed diabetics to help determine how elevated their uncontrolled blood glucose levels have been.

Case 6:06-cv-03086-REL   Document 12   Filed 02/12/07   Page 15 of 40

which means his average blood glucose level over the past couple of months had been about 180 (normal is 100) (Tr. at 171).

On July 16, 2002, plaintiff saw Angela Olomon, D.O. (Tr. at 184). Plaintiff said he could tell no difference with Depakote and he had no response to Trazodone. Dr. Olomon recommended he discontinue Trazodone and she prescribed Remeron. She continued plaintiff on Depakote.

On July 31, 2002, plaintiff saw William Mathews, D.O. (Tr. at 194). "The patient has just been sitting around at home. He doesn't work outside the home and seems not to want to be too busy." Dr. Mathews ordered lab work.

On July 31, 2002, plaintiff had blood work done which showed his cholesterol high at 246 (normal is below 239) (Tr. at 168-169). High HDL was low at 27 (normal is above 35) and his LDL was high at 173 (normal is below 130).

On August 19, 2002, plaintiff saw Hilda Buckles, R.N., in the office of Angela Olomon, D.O. (Tr. at 181). Plaintiff reported suicidal ideation in during the last two weeks, but he denied intent. She noted he was slowly improving. She assessed bipolar disorder type II and recommended he continue his current medications.

August 31, 2002, is plaintiff's alleged onset date.

On September 3, 2002, plaintiff was seen by Angela Olomon, D.O. (Tr. at 180). "Need to get on SSI disability - I kinda quit taking medications a week or so ago." Most of this record is illegible. She assessed bipolar disorder and recommended he resume all medications.

16

On September 9, 2002, plaintiff saw Angela Olomon, D.O. (Tr. at 179). He said he was better since he was back on his medicine. She noted his thoughts were better, no hallucinations or paranoia. She assessed Bipolar Disorder Type II, told him to continue his current medications and to come back in two weeks.

On September 18, 2002, plaintiff filed his application for disability benefits.

On September 23, 2002, plaintiff was seen by Angela Olomon, D.O. (Tr. at 178). She noted that he was compliant with his medication, and there was a benefit noted with the medication. He had no psychosis, no hallucinations, no mood swings. She assessed bipolar disorder, type II, and recommended he continue his current medications and return in four weeks.

On September 24, 2002, plaintiff saw Joyce Nichols, RN, for a check up on his diabetes (Tr. at 192). Plaintiff had not been checking his blood sugar. Ms. Nichols told plaintiff to check his blood sugar two to three times per day and set up an appointment with an eye doctor for a full dilated eye exam secondary to the complications of diabetes. He was told to modify his diet and keep a record of his sugars. Plaintiff's hypertension medication was increased.

On September 24, 2002, plaintiff had blood work done which showed his HGB A1C at 9.2, which means his average blood glucose level over the past couple of months had been about 210 (normal is 100) (Tr. at 166).

On September 29, 2002, plaintiff's application for disability benefits was denied.

On October 9, 2002, plaintiff saw Joyce Nichols, RN, for a check up on his diabetes (Tr. at 191). Plaintiff said his blood sugar had been running between 300 and 400. "Bacil has a long

17

history of uncontrolled diabetes with a lot of denial as he tends to never really take care of himself." Plaintiff was told to check his blood sugar twice a day and keep a record of the results.

On October 9, 2002, plaintiff had blood work done which showed his triglycerides at 1,250 (normal is less than 150) (Tr. at 165).

On December 6, 2002, Kenneth Bowles, Ph.D., completed a Mental Residual Functional Capacity (Tr. at 203-205). Dr. Bowles found that plaintiff was not significantly limited in the following areas:

- The ability to remember locations and work-like procedures

- The ability to understand and remember very short and simple instructions

- The ability to carry out very short and simple instructions

- The ability to maintain attention and concentration for extended periods

- The ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances

- The ability to sustain an ordinary routine without special supervision

- The ability to work in coordination with or proximity to others without being distracted by them

- The ability to make simple work-related decisions

- The ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods

- The ability to ask simple questions or request assistance

- The ability to respond appropriately to changes in the work setting

- The ability to be aware of normal hazards and take appropriate precautions

18

- The ability to travel in unfamiliar places or use public transportation

- The ability to set realistic goals or make plans independently of others

He found that there was no evidence of limitation in the following areas:

- The ability to accept instructions and respond appropriately to criticism from supervisors

- The ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes

- The ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness

He found that plaintiff was moderately limited in the ability to interact appropriately with the general public. And he found that plaintiff is markedly limited in the following areas:

- The ability to understand and remember detailed instructions

- The ability to carry out detailed instructions

Dr. Bowles then completed a Psychiatric Review Technique (Tr. at 207-220). He found that plaintiff suffers from bipolar disorder, type II, which is an affective disorder. He found that plaintiff has no restriction of activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and has no repeated episodes of decompensation (Tr. at 217). In support of his findings, Dr. Bowles wrote the following:

> Treating psychiatrist presents a history of stabilization with adherence to psychopharmacotherapy. Claimant hospitalized 1/18-28/02 with depression and suicidal ideation, apparently attributable to multiple severe stressors and no medication (GAF 30, but MS [mental status] largely unremarkable); he was started on antidepressant medication and improved (Dr. Babin). Follow up treatment with Dr. Olomon indicated clmt. stopped meds 2/02 and on 4/02 eval (GAF 50/65) meds were restarted. Again 9/02 Subjective: "Need to get on SSI disability - I kinda quit taking medications a week or so ago." Clmt. resumed medications, and though Objective assessment 10/02 indicated

19

anxiety, depression and irritable with continued stressors (K. Lulley, MA, NPC, w/Dr. Olomon's countersignature). ADLs [activities of daily living] suggest social impairments, not cognitive.

On December 19, 2002, plaintiff saw Joyce Nichols, RN (Tr. at 225).  "He is under intensive therapy with Dr. Olomon.  He is quite depressed.  He is with his wife.  She said that if he doesn't get any better by next week they are going to hospitalize him.  Bacil reports he quit all of his diabetic and lipid medicine.  The only medicine he's taking is his psych medications, which include Depakote, Zyprexa, and Lexapro.  I did discuss with Bacil that he has always been noncompliant with his diabetic medicine.  He has been very sporadic in his care. . . .  His wife is trying to encourage him to take his medicines.  He doesn't feel like it is really necessary."  Plaintiff's blood sugar was 322.  Ms. Nichols gave him an insulin injection.  "I encouraged him to get on his medicine as the more he takes control of this disease instead of letting the diseases control him the better he will feel.  I discussed with him very frankly the long-term sequela[7] of uncontrolled diabetes, including heart disease, renal failure, amputation, and blindness. . . .  They will follow-up with Dr. Olomon.  I offered to call her to see if we could not get him in the hospital sooner and they declined. . . .  I again reinforced the need to take more control of his life by taking his medicines."

On December 27, 2002, plaintiff saw Joyce Nichols, RN (Tr. at 226).  Plaintiff said he was not checking his blood sugar at home.  He was taking his medicines, Amaryl and Altace.  He had been out of the Lipitor so he had not taken that.  Plaintiff said he was taking his depression medicines and "emotionally he feels like he is doing better overall."  Plaintiff's lab work showed

_____

[7]A pathological condition resulting from a disease.

Case 6:06-cv-03086-REL   Document 12   Filed 02/12/07   Page 20 of 40

triglycerides of 2,341 (normal is less than 150). "He was given samples of Actos way back in October and he doesn't take that. It is very difficult to determine what he does as far as what medicines he is taking and not taking." Ms. Nichols observed that plaintiff was relaxed, interactive, his affect seemed relaxed. She assessed uncontrolled diabetes and hyperlipidemia. She took another blood sugar, which was 262. She gave him a prescription for Lipitor and told him "how imperative it is that he takes it." She added Glucophage for his diabetes, and she told him to continue taking Amaryl and Altace.

On December 30, 2002, plaintiff saw William Mathews, D.O., for chest congestion (Tr. at 227). Dr. Mathews observed that plaintiff seemed to be "his normal self. He is calm and in no distress."

On January 15, 2003, plaintiff saw Diane Valentine, FNP (Tr. at 228). "Today he vaguely discusses his medications, does not seem to be aware of the dosing and initially is not recalling beginning on the Glucophage. When questioned further he does believe that he did get a prescription and is taking the Glucophage at bedtime as prescribed." Plaintiff said he was monitoring his blood sugar at home and it was around 250. His wife complained that he was sleeping a lot during the day. Plaintiff's blood sugar at the office was 285. Ms. Valentine assessed uncontrolled diabetes and hyperlipidemia. She encouraged plaintiff to take his medications as prescribed. "I have encouraged him to watch his diet and begin regular daily exercises such as walking."

On January 29, 2003, plaintiff saw Joyce Nichols, RN (Tr. at 231). "[H]is wife said that she was going to tell me, because he wasn't, that he has developed a testicular lump on the right

testes." Plaintiff said he was checking his blood sugar and taking his medicine as prescribed. He was still smoking a pack of cigarettes per day. "He reports that he has never been on insulin but in reviewing his past medical history, he had been on insulin. . . . He does not know how to give himself insulin injections, his wife does, and we reviewed that in the office today." Ms. Nichols observed that plaintiff was relaxed. His fasting blood sugar in the office was 290. Plaintiff was prescribed insulin injections, and he and his wife were trained on giving the injections. He was told to continue with his oral diabetes medications. An appointment was made to have plaintiff see a specialist and have CT scans of the testes and pelvis. "I again reinforced to him the hazards of uncontrolled diabetes, including sudden cardiac death, blindness, renal failure, and amputation." She also again told plaintiff to stop smoking.

On February 5, 2003, plaintiff saw Joyce Nichols, RN (Tr. at 232). The nodule in his testicle was an epidydymal cyst (Tr. at 318). Plaintiff said his blood sugar at home was 447. "In doing a dietary history, he said he gave up all pop but he is drinking gallons of Sunny Delight, and I discussed with him the hazards of all of this sugar. When I told him that he could go into a diabetic coma he started laughing and said, 'Well, you never know.'" Ms. Nichols observed that plaintiff was relaxed. His blood sugar in the office was 408. He was given an insulin injection. "I encouraged him to be more diligent due to the hazards of uncontrolled diabetes and he looks at me as if this is not serious. . . . I encouraged him to take the insulin shots."

On February 12, 2003, plaintiff saw Joyce Nichols, RN (Tr. at 233). Plaintiff said he had been checking his blood sugar four times a day and it had been running around in the 200s. "Brenda wanted to know what she could do to get Bacil to give him his shots, as they are leaving

town and she wanted her seven-year-old son Samuel to give him shots and I told Bacil that he was the adult and parent in the family and that he needed to take responsibility for learning how to inject his own insulin and not to put that type of responsibility on a seven-year-old child. Bacil will be staying in Humansville while the mother and daughter go to Memphis for her evaluation." Ms. Nichols observed that plaintiff was relaxed in the exam room. She diagnosed uncontrolled diabetes and told him to come up with a plan to reduce his smoking consumption.

On April 2, 2003, plaintiff saw Diane Valentine, FNP, for a diabetes follow up (Tr. at 234). His blood sugar had been 315 at home that morning. "[H]e states that he has had no medicines of any kind for at least the past two weeks." He had not been taking his depression medication prescribed by Dr. Olomon. Ms. Valentine observed that plaintiff was "well appearing. He does have somewhat of a flat affect but he is conversing well, is appropriate, and even smiles at intervals." She assessed uncontrolled diabetes and instructed him to take all of his medications as prescribed.

On April 11, 2003, plaintiff saw Joyce Nichols, RN (Tr. at 235). "He is not fasting in which he knows he needs to fast here every time he comes for a diabetic checkup. He is not taking his insulin when he goes to Memphis and I asked him why. He says I don't know. I stress with him that insulin can be taken and kept at room temperature as long as you do not have the temperature extremes. He has had no breakfast this morning but had a regular soda. I reviewed with him his A1C on the last visit, which was 10.3 [indicating an average blood sugar of 240 over the past few months]. He has no rationale as to why he is not taking care of himself other than he realizes that if he does not he will die." Ms. Nichols assessed uncontrolled diabetes. She told

23

him how important it is to carry his insulin with him everywhere he goes and to check his sugar "which he is not."

On April 15, 2003, plaintiff saw Joyce Nichols, RN (Tr. at 236). He said he had tried to get back on his insulin regimen. When he checks his sugar, it was running around 300. "He takes his medicine sporadically. He checks his sugar sporadically and he doesn't seem to be too alarmed or care whether his blood sugar is out of control." Ms. Nichols assessed uncontrolled diabetes. "I was very frank with Bacil that there was really nothing more I could do for him. That it is all up to him. He has been educated, his medications have been provided. It is really up to him to start taking some control over his life and his disease. Empathy was offered as I realize that this is a 24 and 7 type disorder that needs constant vigilance and it really takes some of his own effort to start getting things under control. . . . He can come back in a month if he wants to so we can recheck his sugar but until he starts taking some action for himself there really is nothing more I can do. I will let Dr. Olomon know this and I will also let Dr. Mathews know as well as far as my concerns about this."

On June 24, 2003, plaintiff saw Joyce Nichols, RN, for cough and congestion (Tr. at 237). He reported he was using his insulin. Ms. Nichols observed that plaintiff was relaxed in the exam room. "He wanted to know what the Niaspan was for and I told him it was for his triglycerides that were over 2000. He didn't know whether he needed to take that or not and I encouraged him to get on that and I also encouraged him for a reschedule for fasting lab work and diabetic evaluation sometime this week and he said that he would."

On June 25, 2003, plaintiff saw Joyce Nichols, RN (Tr. at 238). He said at home his blood sugar was around 280. Plaintiff was taking all of his medication, and he said he was really trying to work on keeping his blood sugar under control, including his diet. Ms. Nichols observed that plaintiff was relaxed in the exam room. She diagnosed uncontrolled diabetes and hypertriglyceridemia. She increased his insulin and told him to continue with his oral medication regimen.

On July 29, 2003, plaintiff saw Joyce Nichols, RN (Tr. at 239). Plaintiff was using his insulin and said his blood sugar never goes over 250 to 280. "Emotionally he said he is starting to feel a little more relaxed and more under control." His wife and daughter were in Memphis and he was caring for his young son. "He is denying any health complaints other than here for a refill on his meds and to get his blood sugar checked." Ms. Nichols observed that plaintiff was relaxed and calm, his affect was appropriate. His fasting blood sugar was 371. She increased his Amaryl and told him to continue using his insulin. "I told him that it was really up to him as far as managing this disease and how important it is for him to get things under control to prevent long-term sequela.

On September 8, 2003, plaintiff saw Angela Olomon, D.O. (Tr. at 287). He reported that he has been stressed a lot trying to cope with his son. His wife and daughter were gone and he was left to take care of his son alone and felt he had a short fuse. Dr. Olomon increased plaintiff's Wellbutrin and recommended psychotherapy.

On October 20, 2003, plaintiff saw Angela Olomon, D.O. (Tr. at 289). He reported he was improving, was sleeping OK, had no suicidal ideation. He was complaint with his

25

medications. Dr. Olomon told plaintiff to continue on the same medications.

On December 2, 2003, plaintiff saw Angela Olomon, D.O. (Tr. at 291). He was compliant with his medication, his sleep was OK, but he reported sleeping some in the daytime while his son was at school. His appetite was fine. Dr. Olomon decreased plaintiff's Depakote.

On January 5, 2004, plaintiff saw Angela Olomon, D.O. (Tr. at 292). He had been out of medication for ten days. Dr. Olomon continued plaintiff on the same medication and reinforced the need for compliance.

On February 2, 2004, plaintiff saw Angela Olomon, D.O. (Tr. at 293). Plaintiff reported he was sleeping 12-14 hours each day, that he was using sleep as a way of avoiding getting up due to depression. He reported that he had been taking his medication. Dr. Olomon continued plaintiff on the same medications and offered individual therapy.

On February 13, 2004, William Mathews, D.O., completed a check-mark type form at the request of plaintiff's disability attorney (Tr. at 284-285). He was asked the following questions and answered yes to all of them: Is it necessary for plaintiff to take bed rest or lie down whenever he has a headache? Does plaintiff suffer from severe unpredictable headaches two times weekly requiring him to lie down from three to five hours at a time? Are plaintiff's symptoms consistent with his medical condition? Does plaintiff have a medical impairment that could reasonably be expected to cause these symptoms? This form states that plaintiff's administrative hearing was set for March 18, 2004.

On March 1, 2004, plaintiff saw Angela Olomon, D.O. (Tr. at 294). Plaintiff reported severe mood swings and the return of migraine headaches, which had remained absent for several

months up until now.  He reported symptoms of insomnia.  Dr. Olomon recommended therapy.

On March 8, 2004, plaintiff saw Angela Olomon, D.O. (Tr. at 295).  He reported he was sleeping 10 to 12 hours per day and was fatigued in the morning despite an improved sleep ability.  He reported that he had the stress of his son acting out.  Dr. Olomon observed that plaintiff's hygiene was good.  She continued him on the same medication.

On May 3, 2004, plaintiff saw Joyce Nichols, RN, to get a prescription for a glucometer (Tr. at 298).  "Bacil has not been in our office since July 29, 2003, for his uncontrolled diabetes.  His sugar at that time was 371.  He was scheduled to follow up in one month.  He failed to do so."  Ms. Nichols observed that plaintiff was relaxed in the exam room.  His vitals were within normal limits.  Plaintiff had bilateral tinea pedis (foot fungus) and a lot of hypertrophic nails (increase in bulk).  She assessed uncontrolled diabetes and neuropathy.  She gave plaintiff Mentax (topical antifungal medication).  "I again reinforced with Bacil that if we do not get this blood sugar under control, he will not live long.  Due to the hazards of sudden cardiac event or stroke, it is imperative that he try to take his medicines as prescribed and when I told him that he had neuropathy of his feet, he looked down and he states, "Ya" . . . I stressed with him how important it is to use the Mentax cream.  Any break in the skin integrity of the lower extremity, even uncontrolled diabetes is a portal entry for infection. . . .  New prescription was given for him for a new machine.  He is to continue on his present medicines."

On May 4, 2004, plaintiff saw Angela Olomon, D.O. (Tr. at 299).  He said things were going okay.  His sleep was good, his mood swings had improved.  She continued him on his same medications.

On May 24, 2004, plaintiff saw William Mathews, D.O. (Tr. at 301). "Bacil was doing some heavy lifting this morning. He heard his elbow pop and then he began to have pain." Dr. Mathews observed that plaintiff "appeared to be his normal self." X-rays showed a possible chipped bone in the elbow. Dr. Mathews put plaintiff's arm in a sling and scheduled him with an orthopedic specialist the next day. However, plaintiff failed to keep that appointment (Tr. at 302).

On June 1, 2004, plaintiff saw Angela Olomon, D.O. (Tr. at 303). Plaintiff said he was doing "so so". He said it was hard to sleep at night because he was sleeping too much during the day. His appetite was good. She continued him on his same medications and scheduled an appointment for him with Tom Leslie for counseling.

On June 22, 2004, plaintiff saw Diane Valentine, RN, for coughing and nasal congestion (Tr. at 304). Ms. Valentine observed that plaintiff was "friendly and well appearing". He was diagnosed with sinusitis.

On June 28, 2004, plaintiff went to Dr. Olomon's office, but the notes say he would not come in to be seen (Tr. at 305). On July 12, 2004, he left without having been seen (Tr. at 305). On July 26, 2004, he was seen, and said he had been out of his medications for two weeks and his wife said it had been "awful". He had been having conflicts with his wife over their daughter's terminal illness. Dr. Olomon talked to plaintiff about compliance with medication. He said he planned to restart his medication.

On July 28, 2004, plaintiff saw Diane Valentine, RN (Tr. at 307). Plaintiff needed refills of his insulin prescription. His blood sugar had been averaging about 270. "He also vaguely

insinuates that he has been out of the insulin, although the prescription was renewed last July and he should have had refills as needed for this entire year." Plaintiff said he had not been taking his Amaryl (oral diabetes medication) or his Lipitor (for high triglycerides). Plaintiff was given refills of his medications.

On August 3, 2004, a nurse discussed with plaintiff the results of his lab work (the signature is illegible). The notes say, "triglycerides up, 2084!! Apparently had not previously increased Lipitor as directed. . . . Strongly urged to watch diet/carbs".

On August 30, 2004, Angela Olomon, D.O., completed a Medical Source Statement Mental (Tr. at 309-311). Dr. Olomon found no significant limitation in the following:

- The ability to ask simple questions or request assistance.

- The ability to be aware of normal hazards and take appropriate precautions

She found moderate limitation in the following:

- The ability to understand and remember very short and simple instructions

- The ability to carry out very short and simple instructions

- The ability to maintain attention and concentration for extended periods

- The ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances

- The ability to sustain an ordinary routine without special supervision

- The ability to make simple work-related decisions

- The ability to accept instructions and respond appropriately to criticism from supervisors

- The ability to respond appropriately to changes in the work setting

She found marked limitation in the following:

- The ability to remember locations and work-like procedures

- The ability to understand and remember detailed instructions

- The ability to carry out detailed instructions

- The ability to work in coordination with or proximity to others without being distracted by them

- The ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods

- The ability to interact appropriately with the general public

- The ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes

- The ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness

- The ability to travel in unfamiliar places or use public transportation

- The ability to set realistic goals or make plans independently of others

At the conclusion of the form, Dr. Olomon stated that she had not separated drug addiction or alcoholism addiction from her assessment (Tr. at 311).

C.    *SUMMARY OF TESTIMONY*

During the July 19, 2004, hearing, plaintiff testified; and Michael Lala, a vocational expert, testified at the request of the ALJ.

1.    **Plaintiff's testimony.**

At the time of the hearing, plaintiff was 39 years of age and is currently 41 (Tr. at 50). He was 5'10" tall and weighed 200 pounds (Tr. at 51). Plaintiff is married, but his wife is not employed (Tr. at 51). He has a driver's license, and his only problem driving is having trouble

30

seeing at night (Tr. at 51). He was able to drive an hour and a half without stopping from his home to where the hearing was held (Tr. at 51-52).

Plaintiff dropped out of school in the tenth grade (Tr. at 52). He can read some, he can add and subtract, but he cannot write a letter or a grocery list (Tr. at 52).

Plaintiff testified that he used marijuana "in earlier days" but was not using it at the time of the hearing (Tr. at 53). He said he used it before the 1990s, when he was about 25 (Tr. at 53).

Plaintiff has a ten-year-old child who has had cancer since 1997, she went through chemotherapy, radiation, and a bone marrow transplant (Tr. at 54, 55). At the time of the hearing, plaintiff's daughter had about two or three months to live (Tr. at 54). When asked whether he was not working because of his child or not working because of his disability, plaintiff said he could not work because "other than my diabetes being real high and the blood sugar being so high, the nerve damage that's done to my feet and my legs." (Tr. at 54-55).

Plaintiff lives in a trailer on eight acres owned by his mother (Tr. at 55). He lives with his wife and two children, his ten-year-old daughter and an eight-year-old son (Tr. at 55). In exchange for living in his mother's trailer, plaintiff was helping her out by mowing the yards of four rental houses she had (Tr. at 56). She has since sold those houses, and he has not done any odd jobs for her for over two years (Tr. at 56).

Plaintiff is not on any medication for headaches (Tr. at 56). He gets drowsy and fatigued from the medications that he is on (Tr. at 57).

31

Plaintiff's alleged onset date is August 31, 2002, which was around the time he applied for benefits (Tr. at 57). There is nothing special about that day that made him become disabled (Tr. at 57).

Plaintiff was treated for testicular cancer in 1991 (Tr. at 58). He has diabetes, and he gets daily sugar readings of 300 to 350 despite taking insulin and Novaloft (Tr. at 61). When asked about the notes regarding non-compliance, plaintiff said that it was very hard to keep all of his appointments and keep up with his doctors because he had been traveling back and forth to Tennessee with his daughter (Tr. at 61). Plaintiff testified that he is using his insulin as prescribed (Tr. at 61). Plaintiff has weekly episodes of headaches due to high blood sugar (Tr. at 62). Plaintiff needs to rest about two to three hours when his blood sugar is high (Tr. at 62). Plaintiff has nerve damage in his feet (Tr. at 62). That causes constant pain and numbness in his feet (Tr. at 63). Walking makes those symptoms worse (Tr. at 63).

Plaintiff has bipolar disorder, and he suffers from episodes of depression (Tr. at 64). He sleeps too much and he does not eat (Tr. at 64). He also has trouble with fatigue and concentration (Tr. at 65). Plaintiff has had suicidal thoughts, and he has had visual hallucinations (Tr. at 65). These are not a problem, however, and he last experienced that three months ago (Tr. at 65). Plaintiff tried to commit suicide three months earlier by taking a drug overdose, and he was treated at the Methodist Hospital in Memphis, Tennessee (Tr. at 66). Plaintiff does not have any manic phases (Tr. at 66).

Plaintiff believes he could walk for 30 to 45 minutes at a time (Tr. at 67). He could sit for a couple of hours at a time (Tr. at 67). He thinks he could lift a maximum of ten pounds (Tr. at

32

67-68). Plaintiff has to rest for several hours due to back pain (Tr. at 68). Plaintiff does not do housework due to fatigue and sleeping too much (Tr. at 68). His wife does the housework, and he mows the yard for 20 minutes at a time with a push mower (Tr. at 68-69). Plaintiff's wife does the laundry and he takes out the trash (Tr. at 70).

Plaintiff spends his days either sleeping or spending time with his kids (Tr. at 69). His daughter has not been to school in two years due to the bone marrow transplant (Tr. at 69). She has had her right leg amputated and has a prosthesis (Tr. at 70). Plaintiff only provides spiritual care for his daughter (Tr. at 70).

**2.      Vocational expert testimony.**

Vocational expert Michael Lala testified at the request of the Administrative Law Judge. The first hypothetical involved a person with the mental residual functional capacity as assessed by Dr. Bowles, i.e., a person who could understand and remember at least simple instructions and complete at least simple tasks, could relate adequately without frequent contact with the public, able to adjust to a simple work environment and normal changes within a simple work environment (Tr. at 73). The vocational expert's answer was inaudible (Tr. at 73).

The second hypothetical included the first but also restricted the person to light exertional activity (Tr. at 73). The vocational expert merely said that plaintiff reported he worked as a delivery route/truck driver at a light level; however, he failed to answer the ALJ's hypothetical question audibly[8] (Tr. at 73).

---

[8]There are many, many "inaudible" notations in the transcript of the administrative hearing. However the ALJ stated that he was relying on the testimony of the vocational expert that a person with these abilities could return to plaintiff's past relevant work; therefore, it is reasonable

33

The third hypothetical included the first but also restricted the person to sedentary work (Tr. at 74). The vocational expert testified that the person could not perform plaintiff's past relevant work, but could be a hand mounter, D.O.T. 976.684-018, with 1,300 in Missouri and 141,000 in the national economy (Tr. at 74). A hand mounter works in the auto finishing department (Tr. at 74). The person could also be an addresser, D.O.T. 209.587-010, with 1,550 in Missouri, and 125,000 in the nation (Tr. at 75).

The next hypothetical included an individual with sedentary work capability but who would need to take a few hours of rest during the work day (Tr. at 75). The vocational expert testified that such a person could not work (Tr. at 75).

The next hypothetical involved a person who would miss one day of work out of five, and the vocational expert testified that the person could not work (Tr. at 75).

## V.    FINDINGS OF THE ALJ

On October 29, 2004, Administrative Law Judge L.W. Henry entered an order finding plaintiff not disabled (Tr. at 18-25). The ALJ found that plaintiff had not engaged in substantial gainful activity since his alleged onset date (Tr. at 20). The ALJ found that plaintiff suffers from diabetes mellitus and bipolar disorder, severe impairments; however, plaintiff's headaches are not severe (Tr. at 20). The ALJ found that plaintiff's impairments do not meet or equal a listed impairment (Tr. at 20).

The ALJ determined that plaintiff retained the residual functional capacity to lift ten pounds frequently and 20 pounds occasionally, sit for six hours per day, stand or walk for six

---

to assume that the ALJ had so testified.

34

hours per day, understand and remember at least simple instructions and complete at least simple tasks with adequate pace and persistence, able to relate adequately well in settings that do not require frequent contact with the public, and can adjust to a simple work environment and to normal changes therein (Tr. at 23). This residual functional capacity permits work at the light exertional level (Tr. at 23).

The ALJ then found that with this residual functional capacity, plaintiff can return to his past relevant work as a delivery route truck driver, not as normally performed, but as plaintiff previously performed it (Tr. at 23-24). Plaintiff was therefore found not disabled at the fourth step of the sequential analysis.

## VI.    PLAINTIFF'S RESIDUAL FUNCTIONAL CAPACITY

Plaintiff argues that the ALJ erred in assessing plaintiff's residual functional capacity. Specifically plaintiff argues that the ALJ erred in failing to consider plaintiff's headaches, as uncontrolled diabetes can cause frequent headaches and plaintiff had difficulty controlling his diabetes. Plaintiff testified that he has weekly headaches due to his high blood sugar. However, there is no complaint of headaches related to his diabetes anywhere in the medical records. The ALJ noted that plaintiff complained of headaches before his alleged onset date and associated with abdominal pain and vomiting. Plaintiff was able to perform normal activities, and "headache" was not diagnosed. Plaintiff complained of a headache associated with sinusitis which resolved with treatment. Plaintiff complained of a migraine in March 2004, and said he had not had headaches in the past few months. Plaintiff was never treated for headaches, and indeed he testified that he was not on any medication for headaches.

35

If plaintiff did indeed suffer from headaches due to his uncontrolled diabetes (headaches he never complained about to his doctors), those headaches would not form a basis for disability. Plaintiff's diabetes was uncontrolled because he was noncompliant with taking his medication and with controlling his diet. The record is full of admonitions from his treating doctors and nurses that he needed to check his blood sugar regularly, take his medication regularly, and adhere to a diabetic diet. Instead, plaintiff rarely took his blood sugar regularly, he refused to take his insulin with him when he left home, he tried to get his seven-year-old son to administer the insulin shots because he did not want to give himself shots, he repeatedly stopped taking his oral diabetes medication, he drank gallons of Sunny Delight (a drink with a high concentration of sugar), he drank regular soda instead of eating meals, and he refused to eat a diabetic diet.

When an impairment can be controlled by treatment or medication, it cannot be considered disabling. Brown v. Barnhart, 390 F.3d 535, 540 (8th Cir. 2004). Failure to follow a prescribed course of remedial treatment without good reason is grounds for denying an application for benefits. Id.; 20 C.F.R. § 416.930(b). If plaintiff suffered from headaches as a result of his uncontrolled diabetes, those headaches cannot be considered disabling as plaintiff's diabetes was uncontrolled by his own choice.

Plaintiff testified that he found it difficult to keep his appointments because he was taking his daughter back and forth to Tennessee for cancer treatments. However, the record does not reflect many missed appointments. Rather, the record reflects that plaintiff chose to stop taking his medication even when samples were provided, he refused to adhere to a diabetic diet, he refused to keep track of his blood sugar levels. None of these actions are the result of plaintiff

36

driving his daughter to Tennessee. In fact, the record reflects that on several occasions, plaintiff's wife drove their daughter to Tennessee while plaintiff stayed behind to care for their son.

An ALJ bears the primary responsibility for assessing a claimant's residual functional capacity based on all of the relevant evidence. Roberts v. Apfel, 22 F.3d 466, 469 (8th Cir. 2000); Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir. 1995). Relevant evidence includes the medical records, observations of treating physicians and others, and an individual's own description of his limitations. McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000); Anderson v. Shalala, 51 F.3d at 779.

The ALJ found that plaintiff retained the ability to lift ten pounds frequently and 20 pounds occasionally, sit for six hours per day, stand or walk for six hours per day, understand and remember at least simple instructions and complete at least simple tasks with adequate pace and persistence, is able to relate adequately well in settings that do not require frequent contact with the public, and can adjust to a simple work environment and to normal changes therein.

Plaintiff testified that he could lift a maximum of ten pounds. However, on May 24, 2004, plaintiff was doing "heavy lifting" and hurt his elbow. There is nothing in any medical record about plaintiff having trouble lifting.

Plaintiff testified he could sit for a couple of hours at a time. There is nothing in any medical record wherein plaintiff complained of difficulty sitting. Plaintiff drove for an hour and a half to the hearing without stopping, and plaintiff testified that he regularly drove his daughter to Tennessee for cancer treatments. There is no evidence that plaintiff has any limitation in his

Case 6:06-cv-03086-REL   Document 12   Filed 02/12/07   Page 37 of 40

ability to sit.

Plaintiff testified that he thinks he could walk for 30 to 45 minutes at a time, but again there is nothing anywhere in the medical records wherein plaintiff complained of any difficulty with standing or walking. Plaintiff testified that he has to rest for several hours each day due to back pain; however, plaintiff never complained of back pain during the approximately 15 years' worth of medical records he submitted.

The ALJ found that plaintiff could understand and remember at least simple instructions. Dr. Bowles found that plaintiff was not significantly limited in his ability to understand and remember very short and simple instructions. Dr. Olomon found that plaintiff was moderately limited in this ability. However, a review of her treatment records reveals that plaintiff never complained of any problems understanding or remembering very short and simple instructions. Dr. Olomon made no notes of any mental tests performed. Rather, her notes are very short and consist mainly of admonishing plaintiff to take his medication as directed and recommending counseling (although there are no records showing that plaintiff ever participating in counseling). In addition, Dr. Olomon was clear that her assessment included impairments based on plaintiff's drug abuse.

The ALJ found that plaintiff could complete at least simple tasks with adequate pace and persistence. Dr. Bowles found that plaintiff was not significantly limited in this area, and Dr. Olomon found that plaintiff was moderately limited. Again, there is nothing in Dr. Olomon's records to support any limitation on plaintiff's ability to complete simple tasks. The medical records establish that plaintiff was able to drive his daughter to Tennessee for cancer treatments,

38

he was able to stay home and care for his young son by himself while his wife and daughter took trips to Tennessee.

The ALJ found that plaintiff is able to relate adequately well in settings that do not require frequent contact with the public. Dr. Bowles found no significant limitation in this area, and Dr. Olomon found marked limitation in the ability to work with others. The ALJ's limitation that plaintiff should not have frequent contact with the public takes into account any limitation in this area.

The ALJ found that plaintiff can adjust to a simple work environment and to normal changes therein. Dr. Bowles found no significant limitation in this ability, and Dr. Olomon found moderate limitation in this ability. Again, the evidence establishes that plaintiff was able to make trips to Tennessee for his daughter's health care and was able to stay home and take care of himself and his son by himself.

Finally, I point out that plaintiff was specifically asked why he is unable to work. He said he could not work because his blood sugar was very high and he has nerve damage to his feet and legs. Plaintiff did not testify that he is unable to work due to a mental impairment beyond that found by the ALJ.

Based on all of the above, I find that the substantial evidence in the record supports the ALJ's finding regarding plaintiff's residual functional capacity.

VII.    ABILITY TO PERFORM PAST RELEVANT WORK

Plaintiff next argues that the ALJ erred in finding that plaintiff could perform his past relevant work as a delivery truck driver. Specifically, plaintiff argues that the ALJ failed to

determine the mental demands of plaintiff's past relevant work.

The ALJ may use the services of a vocational expert to obtain evidence needed to determine whether a claimant can perform his past relevant work. 68 FR 51153, 51163 (August 26, 2003). The vocational expert testified that a person with the physical and mental residual functional capacity found by the ALJ would be able to perform plaintiff's past relevant work as a delivery truck driver as he performed it. The ALJ properly relied on the testimony of the vocational expert.

I note, however, that even if plaintiff were not able to return to his past relevant work as a delivery truck driver based on the mental demands of that job, the record establishes that plaintiff would be able to do other work available in significant numbers in the economy, i.e., hand mounter or addresser. Therefore, it is clear that even if plaintiff were to prevail on this argument, the record would still not support a finding that plaintiff is disabled.

## VIII.   CONCLUSIONS

Based on all of the above, I find that the substantial evidence in the record as a whole support's the ALJ's finding that plaintiff is not disabled as he is able to return to his past relevant work as a delivery truck driver. Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied. It is further

ORDERED that the decision of the Commissioner is affirmed.


 /s/ Robert E. Larsen
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
February 9, 2007